IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CIGNEX DATAMATICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 17-320 (MN) |
| | ) | |
| LAM RESEARCH CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## **<u>MEMORANDUM OPINION</u>**

Theodore A. Kittila, James G. McMillan, III, HALLORAN FARKAS + KITTILA LLP, Wilmington, DE – attorneys for Plaintiff

Christopher P. Simon, David G. Holmes, CROSS & SIMON, LLC, Wilmington, DE – attorneys for Defendants

April 29, 2020
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

This case arises out of a dispute between Plaintiff CIGNEX Datamatics, Inc. ("Plaintiff" or "CIGNEX") and Defendant Lam Research Corporation ("Defendant" or "Lam") over a contract relating to software development services CIGNEX was to provide to Lam.  The Court presided over a three-day bench trial on June 24 and 26-27, 2019.  (D.I. 118-120).  After trial, the parties submitted proposed findings of fact and post-trial briefs.  (*See* D.I. 113, 114, 115, 116, 121, 122, 123 & 124).  This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.     BACKGROUND

On March 24, 2017, CIGNEX filed the present action, alleging that Lam breached an agreement between the parties, whereby CIGNEX was to provide software development services for Lam's MyLam/PK redesign project.  (D.I. 1 ¶¶ 6, 15-19).  In particular, CIGNEX alleged that it had performed all of its obligations under the parties' agreement but Lam had refused to pay the remainder of the amount due for work that CIGNEX performed – *i.e.*, $434,096.71.  (*Id.* ¶ 11).  On May 15, 2017, Lam answered and filed counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, bad faith breach of contract and unjust enrichment, seeking recovery of at least all payments rendered to CIGNEX over the course of the project – *i.e.*, $739,000.  (*See, e.g.*, D.I. 8 ¶¶ 24-47).

On December 4, 2018, Lam moved for summary judgment on CIGNEX's breach of contract claim, arguing that the contract was not a "time and materials" contract, but rather one that required CIGNEX to complete the MyLam.com redesign project to be entitled to any payment.  (*See* D.I. 74 & 75).  On February 26, 2019, the Court partially denied Lam's motion because it was unable to conclude on the available record that the contract was not a "time and materials"

contract.  (*See* D.I. 94).  The Court did, however, partially grant summary judgment to Lam on one aspect of CIGNEX's alleged damages and reduced the damages claim by $58,000.  (*Id.* at 6).

## II.   <u>FINDINGS OF FACT</u>

This section contains the Court's findings of fact on disputes raised by the parties during trial, as well as uncontested facts to which the parties have stipulated.  Certain findings of fact are also provided in connection with the Court's conclusions of law.  (*See infra* § IV).

### A.   **The Parties**

1.   CIGNEX, a Michigan limited liability company, is a commercial open-source consulting company that provides a wide variety of clients with services and products such as open source enterprise portals, content management, big data analytics, and e-commerce solutions. (SUF ¶ 1; *see also* D.I. 1 ¶ 1).[1]

2.   Lam, a Delaware corporation with its principal place of business in Fremont, California, is in the business of designing, developing, marketing, selling, and supporting equipment that is used by semiconductor manufacturers to make semiconductor chips.  As part of its business, Lam operates a website, www.MyLam.com, a web portal that Lam's customers use to access technical specifications and other information about Lam products, and to place orders. (SUF ¶ 2; *see also* D.I. 1 ¶ 2; D.I. 8 ¶ 2).

### B.   **Fact Witnesses at Trial**

3.   Srinivas Tadeparti was called by CIGNEX to testify at trial as a fact witness. Mr. Tadeparti is Senior Vice President and Delivery Head at CIGNEX.  (Tr. at 25:25-26:5).

---

[1]   Citations to "SUF" are to the Uncontested Facts in the Pretrial Order.  (*See* D.I. 99 § III.A; *see also* D.I. 110).

4.      Harish Ramachandran was called by CIGNEX to testify at trial as a fact witness. Mr. Ramachandran is Chief Executive Officer at CIGNEX.  (Tr. at 189:24-190:3).

5.      Alana Schwermer was called by Lam to testify at trial as a fact witness. Ms. Schwermer is a Project Manager at Lam.  (Tr. at 270:17-20).

6.      Robert Ahrens was called by Lam to testify at trial as a fact witness.  Mr. Ahrens is a Senior Program Manager at Lam.  (Tr. at 346:12-15).

7.      Tim Kolsrud was called by Lam to testify at trial as a fact witness.  Mr. Kolsrud is a Senior Program manager at Lam.  (Tr. at 419:10-16).

8.      Bradley Estes was called by Lam to testify at trial as a fact witness.  Mr. Estes is Senior Director of Knowledge and Event Services at Lam.  (Tr. at 480:21-481:1).

**C.      The Master Services Agreement and Original Scope of Work**

9.      Lam's MyLam.com is an online library of documents related to Lam's products, used by Lam and its customers.  (*See* Tr. at 270:23-271:3, 348:20-21, 420:6-20).  Lam needed to upgrade MyLam.com because, in part, it was no longer going to be supported by Microsoft, and it was outdated.  (*Id.* at 421:3-14).  Lam also wanted to consolidate the portal used by employees with the portal used by its customers into one MyLam.com portal.  (*Id.* at 421:15-20).

10.     After searching for potential vendors to redesign its MyLam.com portal, Lam selected CIGNEX to perform the update.  (Tr. at 271:10-276:9).

11.     CIGNEX and Lam entered into a "Contract for Independent Contractor or Consultant Services" ("the Master Services Agreement" or "the Agreement"), dated October 28, 2014, whereby CIGNEX was to provide certain software development for Lam's MyLam/PK redesign project.[2]  (SUF ¶ 3; *see also* PTX-44, Ex. A ¶ 1).  The Agreement was

---

[2]      PK refers to a part of the old MyLam system.  (*See, e.g.*, Tr. at 32:9-13 & 427:3-12).

executed on October 28, 2014 by Bradley Estes, on behalf of Lam, and by Rajesh Devidasani, Corporate Financial Officer and Executive Vice President of Operations, for Divya Kumat, on behalf of CIGNEX.  (PTX-44 at pg. 4).

12.     The Agreement provided that, in exchange for CIGNEX's services on the MyLam.com redesign project, Lam would pay fees to CIGNEX according to the relevant Statement(s) of Work.  (PTX-44 ¶¶ 1-2; *see also id.*, Ex. A).  As to the services, the Agreement further provided that CIGNEX would provide "such services as may be necessary to complete in a professional manner the project described as follows:  Software integration, and POC [Proof of Concept], for MyLam/PK Redesign Project."  (PTX-44, Ex. A ¶ 1).  Lam was obligated to pay CIGNEX within thirty days of each undisputed invoice for the project.  (PTX-44 ¶ 4).  The Agreement also required waivers, modifications and amendments to the contract terms to be in writing and signed by the party to be charged (*i.e.*, Lam).  (*Id.* ¶ 20).

13.     After the Agreement was signed, CIGNEX undertook the Proof of Concept referenced in the Agreement, which required CIGNEX to provide design and objectives for the Project, including security, user security access controls, vendor capabilities and sample of technical features in the web portal.  (SUF ¶ 4).  CIGNEX had to demonstrate that it had the skill and capability to satisfactorily deliver those features, and this information was presented in "Statement of Work – LAM 001," also referred to as "SOW 1."  (SUF ¶ 4).  Lam paid CIGNEX $10,000 for the Proof of Concept, and Lam thought CIGNEX "did a very good job on" the Proof of Concept.  (Tr. at 274:17-20; *id.* at 423:18-424:1).

14.     After completion of the Proof of Concept, the parties executed "Statement of Work – LAM 002," dated January 16, 2015 ("SOW 2").  (SUF ¶ 5).  Ms. Kumat executed SOW 2 on

behalf of CIGNEX.  (SUF ¶ 6; *see also* JTX-2 at pg. 14).  Mr. Estes executed SOW 2 on behalf of

Lam.  (SUF ¶ 6; *see also* JTX-2 at pg. 14).

15.     SOW 2 set forth the scope of the work that CIGNEX was to perform for the

MyLam.com redesign project, as well as the estimated cost of the project.  (*See generally* JTX-2).

SOW 2 expressly incorporated the terms and conditions of the Master Services Agreement.  (*Id.*

at pg. 1).  Further, SOW 2 provided that the project was to be done on a "time and material" basis.

(*Id.* ("4. Terms & Conditions: Time and Material")).  The project was to occur over several phases

and was estimated to take twenty to twenty-five weeks.  (*Id.* at pg. 7 ("8. Project plan and Phases");

*see also id.* at pg. 1 ("5. Duration: Between 20 to 25 weeks from project start date"); PTX-43 at

pg. 3 (approximate "Go Live" date in June / July 2015)).[3]  SOW 2 also provided that the estimated

cost of the project would be $593,376.  (*Id.* at pg. 12 ("Estimated efforts and Cost" less a 3.654%

discount yielding estimated cost of $593,376)).

16.     The total cost of the work set forth in SOW 2 was broken down by phase, and the

proposal included a "Rate Card" that indicated the hourly rate of various people associated with

the project.  (JTX-2 at pg. 12).  SOW 2 specifically stated that "[t]he staffing, schedule and cost

estimates presented in this proposal are based upon a number of assumptions . . . [and] [c]hanges

to these assumptions will affect the overall cost and delivery schedules of this proposal."  (*Id.* at

pg. 10).  After the detailed cost breakdown, SOW 2 provided:  "This is a Time and Materials

(T&M) estimate.  The time allotted can be used, increased or decreased as needed for budgeting,

project burn down purposes or otherwise."  (*Id.* at pg. 13).

---

[3]     The "Go Live" date is the date on which the redesigned MyLam.com would be complete
        and available for its intended use.  (*See* Tr. at 286:16-23).

17.     SOW2 set forth a series of "CIGNEX Deliverables" to be provided as the project progressed.  (JTX-2 at pgs. 10-11).  SOW 2 also provided that CIGNEX "will walk through the deliverables with Lam and Lam will review and provide feedback to the CIGNEX team within five (5) Business days of deliverable submission."  (*Id.* at pg. 10).  Any changes to the scope of SOW 2 were to be made "using project change management tools and procedures duly signed off by the Lam and CIGNEX representatives."  (*Id.* at pg. 17).  These changes would ultimately take the form of a formal written "Change Request" or "CR," which contained a description of the change, a price for the change and a statement about the impact of the change on schedule.  The parties agreed to work together "to absorb variations from initial functional requirements and discuss trade-offs to balance between scope, schedule and resources (budget)."  (*Id.*).

### D.     Software Requirements Specifications

18.     The first step under SOW 2 was for CIGNEX to draft a document called a Software Requirements and Specifications ("SRS").  (SUF ¶ 7; *see also* JTX-2 at pg. 7).  In general, the purpose of an SRS is "to record all the requirements from a functional and technical perspective." (Tr. at 425:6-7).  An SRS is effectively a "blueprint" for developers to use in the process of building a site.  (*Id.* at 425:7-8).

19.     The SRS for the MyLam.com redesign project was the first "CIGNEX Deliverable" in SOW 2, and it was part of the first phase of the project that would, *inter alia*, "[d]etail out existing use case and requirement at functional level . . . [and] . . . [c]apture Non functional requirement."  (JTX-2 at pg. 7, 10).  The SRS was supposed to capture all of the features that Lam wanted to be included in the redesigned MyLam.com.  (*See, e.g.*, Tr. at 35:4-36:10).  CIGNEX expected Lam to provide the final requirements and approval on the SRS before the project was to begin.  (*See* Tr. at 35:4-11; PTX-43 at pg. 10; *see also* Tr. at 425:22-426:20).

20.     One project manager at Lam expressed doubt to CIGNEX that review of the SRS was necessary or feasible for CIGNEX to begin work on the MyLam.com project.  (*See* Tr. at 540:4-11 (discussing PTX-182)).  Another project manager at Lam understood the SRS to be a "living document" that would continue to be revised and updated as the project evolved.  (*See* Tr. at 315:9-10).  Yet another project manager at Lam said that the SRS "was a constant back and forth" and, further, that CIGNEX struggled with quality and clarity in the SRS drafting process.  (Tr. at 430:18-431:7).

21.     Although the parties exchanged multiple drafts of the SRS, Lam never signed the SRS.  (SUF ¶¶ 8-9; *see also* DTX-108 at pg. 3 (version 2.6 of the SRS, which lists the various versions of the SRS)).  Despite Lam never signing the SRS, CIGNEX proceeded to start development work on the MyLam.com redesign project.  (*See, e.g.*, Tr. at 432:22-433:21).  The last draft of the SRS was dated February 2016, over a year after the project started.  (*See* SUF ¶ 8).

**E.     CIGNEX Starts Work, Issues Arise and the Original Project Scope Changes**

22.     Pursuant to the agreed-upon SOW 2, CIGNEX used an "agile" method of software development for the MyLam.com project, whereby CIGNEX delivered components – known in the industry as "Sprints" – one or more at a time.  (*See* Tr. at 33:21-34:12, 201:17-23).  A Sprint allows a software development project to be broken into smaller pieces to focus on "one type of functionality and build it from a development standpoint, test it, [and] make sure it all works" before moving onto the next functionality.  (Tr. at 434:8-15).  CIGNEX originally estimated that the MyLam.com project would require only four Sprints for completion.  (*See* PTX-43 at pg. 7; *see also* JTX-2 at pg. 7 ("4 Sprints" depicted in chart under "8. Project plan and Phases")).

23.     At some point after CIGNEX began work on the project, issues developed that necessitated a change in scope (and duration of the project).  In March 2015, CIGNEX and Lam

agreed to change requests known as CR-1 and CR-2.  (SUF ¶ 10; *see also* JTX-43 & JTX-44).

CR-1 did not change the ultimate projected end date, but it added $33,661 to the overall cost.

(JTX-43 at pg. 2).  CR-2 added Sprint 5 to the project, as well as four weeks to the project timeline

and an additional $60,651.   (JTX-44 at pg. 4).   Both CR-1 and CR-2 were executed on

April 9, 2015 by Mr. Estes on behalf of Lam.  (*See* JTX-43 at pg. 2; JTX-44 at pg. 4).

24.     Then, in June 2015, CIGNEX and Lam agreed to a change request known as CR-3.

(SUF ¶ 11; *see also* JTX-45).  CR-3 added another $93,760 to the cost of the MyLam.com project

and moved the projected end date to October 9, 2015, which added roughly four weeks to the

previous timeline.  (*See* JTX-45 at pg. 3).  CR-3 was executed on June 11, 2015 by Mr. Estes on

behalf of Lam.  (JTX-45 at pg. 4).  In terms of necessary work on the project, CR-3 added two-

factor authentication and "a very specific kind of authorization and approval process for

administrative log-in."  (Tr. at 56:8-24).  These changes were known as Sprint 6.

25.     CIGNEX also attempted to obtain Lam's approval for two additional change

requests:  CR-4 and CR-5.  Together, CR-4 and CR-5 were known as Sprint 7 for the MyLam.com

project.  (*See, e.g.*, Tr. at 57:10-58:15; PTX-297 at pg. 1; *see also* Tr. at 210:2-15 ("CR 3" in table

of PTX-297 is a typographical error and should read as "CR-5")).

26.     Negotiations about CR-4 were ongoing as of at least December 2015.  (*See* PTX-

297 at pg. 1).  Unlike with the previous change requests, there is no standalone written proposal

for CR-4.  (*See* DTX-108 at pgs. 52-63 (specifications of CR-4 set forth in draft of SRS)).  Through

CR-4, CIGNEX proposed to add $92,800 to the overall cost of the project, which Lam rejected

and counteroffered $66,971.  (*See* PTX-297 at pg. 1).  Lam rejected the proposed additional costs

because it believed one item included in CR-4 was already included in a previous agreement.

(*See, e.g.*, Tr. at 58:16-25, 209:14-210:1, 211:17-212:1).   In response to Lam's counteroffer,

CIGNEX proposed $82,468 for CR-4. (PTX-297 at pg. 1). Lam never agreed in writing (signed or otherwise) to this counteroffer or the scope of work of CR-4.

27.     CR-5 proposed to add an additional $23,345 to the cost of the project but without any delay in the time to completion. (*See* PTX-204 at pg. 2). On January 11, 2016, after CIGNEX sent the CR-5 proposal to Lam, Mr. Estes asked for clarification as to what approval meant in the case of CR-5. (PTX-229 at pg. 3). He further said that he approved "the scope of the work and $$" but did not return an executed copy of the CR-5 proposal. (*Id.*). In response, CIGNEX requested a signed copy of CR-5, as signature approval was customarily done by Lam. (*Id.* at pg. 2). After that point, the parties apparently continued to discuss the details of CR-5 and CIGNEX updated the document "with all the feedback requested" by Lam. (*Id.*; *see also id.* at pg. 1 (Lam managers still reviewing CR-5 in March 2016)). Lam never agreed to CR-5 in a signed writing.

### F.      Lam Stops Paying, CIGNEX Keeps Working and the Project Ultimately Ends

28.     Between February 2015 and June 2015, CIGNEX issued invoices to Lam for time and materials that CIGNEX provided to Lam on the MyLam.com project. (SUF ¶ 15). Also between February 2015 and July 2015, Lam paid CIGNEX $665,985 on these invoices issued by CIGNEX. (SUF ¶ 16). These invoices corresponded to CIGNEX work performed through the end of June 2015. By July 2015, the month the project was originally expected to end (*see* JTX-2 at pg. 1; PTX-43 at pg. 3), the "Go Live" date for the MyLam.com redesign had already been moved several times, ultimately resulting in a projected end date of October 2015 (JTX-45 at pg. 3).

29.     As of mid-July 2015, Lam had not tested any of CIGNEX's work. (Tr. at 437:24-438:4). The testing process involved CIGNEX first performing internal testing on the code and functionalities of MyLam.com before releasing test cases to Lam, which would then do additional

testing (*i.e.*, unit testing).  (Tr. at 439:17-20; *see also* Tr. at 350:24-351:10).  Lam attempted to schedule a meeting for July 7, 2015 for CIGNEX to demonstrate Sprints 4 and 5 but CIGNEX postponed the meeting because of problems they found during internal testing.  (DTX-19 at pg. 1).

30.     Lam brought Mr. Ahrens onto the project in July 2015 to be the test coordinator. (Tr. at 349:8-13).  Once Lam began unit testing in the July timeframe, it was apparent that there were numerous defects in the work performed by CIGNEX so far.  (*See, e.g.*, JTX-24).  Any issues or problems discovered with code released by CIGNEX would be entered as a "ticket" into the JIRA system provided by CIGNEX.  (Tr. at 351:20-352:25).  Both parties had access to the JIRA system to monitor and document issues with code development.  (SUF ¶ 13; *see also* Tr. at 354:15-22 (Mr. Ahrens testifying that CIGNEX apparently had its own JIRA system to monitor issues discovered internally)).

31.     In addition to logging issues in tickets via the JIRA system, Lam would also communicate problems discovered in testing via email and status reports.  (*See* Tr. at 367:15-20 (Mr. Ahrens testifying he would communicate with CIGNEX almost daily); *see also* JTX-24, DTX-31, DTX-34 & DTX-37)).  Even if an issue flagged in a ticket was considered resolved, it would sometimes resurface as a problem in future testing.  (Tr. at 357:6-358:17, 358:24-359:25). In fact, when Lam began testing for Sprints 4, 5 and 6, there were still open tickets for unresolved issues in Sprints 1, 2 and 3.  (*See, e.g.*, Tr. at 372:3-373:13; *see also* DTX-34 at pg. 1 (seventh ticket ever opened in JIRA system still unresolved as testing on Sprints 4-6 underway)). Throughout the testing phase, Lam entered at least 500 tickets into the JIRA system.  (Tr. at 354:15-17).

32.     Shortly after Lam began unit testing in July 2015, CIGNEX sent a status report to Lam that indicated the project was no longer on track for completion by the expected deadline.

(*See, e.g.*, DTX-24 at pg. 3 (moving deadline for completion of Sprint 6 – *i.e.*, CR-3 – by almost three months)).  In that status report, the project "health" was indicated with an amber color, which meant the project was not progressing as planned.  (*See id.* at pg. 2 (amber circle next to "Project Health"); *see also* Tr. at 204:21-205:17).

33.   In August 2015, Lam told CIGNEX that it would not accept or pay any further invoices until CIGNEX could demonstrate that it could complete milestones as presented.  (SUF ¶ 17; *see also* Tr. at 284:13-15).  CIGNEX nevertheless continued to work on the project despite not being paid.  (SUF ¶ 18).

34.   On September 15, 2015, CIGNEX sent a recovery plan that included details on how to correct the issues in the project so far and get the project back on track.  (*See* DTX-28).  This recovery plan moved the projected "Go Live" date to November 14, 2015.  (*Id.* at pg. 3).  Despite this revised date, not even unit testing[4] was completed by the end of November 2015.

35.   On December 2, 2015, CIGNEX presented another "recovery plan" to Lam called the "Go-Green Plan," which moved the completion date to late March 2016.  (DTX-40 at pg. 3; *see also* SUF ¶¶ 20-21).  CIGNEX's Go-Green Plan indicated that there were still issues in Sprints 1-6 requiring resolution and unit testing for all seven sprints was now to be completed by February 12, 2016.  (DTX-40 at pg. 2).  Additionally, the Go-Green Plan demonstrated that Sprint 7 (*i.e.*, CR-4 and CR-5) was still in development, with that development projected to end by December 30, 2015.  (*Id.* at pg. 2).  Lam expressed frustration with the continued delays.  (*See* JTX-8 at pg. 1 ("It is not ideal to keep pushing the date out, however we need to be realistic

---

[4]   In the MyLam.com redesign, unit testing was a prerequisite to integration testing, which was a prerequisite to user acceptance testing (all of which were prerequisites to MyLam.com going live).  (*See, e.g.*, JTX-2 at pgs. 7-9).

on what it takes to be successful.  If this is what it takes then lets [sic] capture this and then ensure we execute.")).

36.     In January 2016, CIGNEX informed Lam that the March 2016 "Go Live" date from the Go-Green Plan would be delayed again.  (SUF ¶ 22; *see also* Tr. at 501:19-23).  Shortly thereafter, Subrumanian Pillai, the original manager on the CIGNEX side (PTX-43 at pg. 5), left the project and was replaced by Mr. Tadeparti (Tr. at 64:24-65:3, 212:25-213:12 & 501:21-502:2; *see also* SUF ¶ 23).

37.     On April 27, 2016, Lam presented a summary of the MyLam.com redesign status so far, along with information regarding missed milestones, new proposed dates for those milestones and the impact of the continued delay on Lam's business.  (*See generally* DTX-54).  In Lam's view, at this point in time, the project was no farther along than it had been in July 2015.  (*See* Tr. at 511:23-24).  In this presentation, the "Go Live" date for MyLam.com was moved again to late July 2016 based on information provided by CIGNEX.  (DTX-54 at pg. 9 & 12; *see also* Tr. at 512:15-22, 513:11-13).

38.     In June 2016, after CIGNEX missed the deadline to complete all Sprint testing (DTX-54 at pg. 11), Lam decided to retain independent consultants to review the work performed by CIGNEX to date and determine whether continued collaboration with CIGNEX could lead to a finished (and viable) product (*see* Tr. at 514:5-515:24).  In July and August 2016, three consultants provided feedback to Lam in the form of reports, and all of the consultants generally concluded that the product being developed by CIGNEX was "at high risk."  (*See* DTX-13, DTX-14 & DTX-15; *see also* Tr. at 516:18-517:24, 523:21-524:15).  The consultants identified security issues with CIGNEX's work, as well as concerns that the new MyLam.com would already be obsolete when completed (or shortly after completion).  (Tr. at 516:25-517:20).  Lam paid over

$112,000 for the work performed by the three consultants.  (Tr. at 516:15-17, 519:17-520:3; *see also* DTX-16).

39.     After receiving reports from the three consultants, Lam approached CIGNEX with the concerns raised in the reports.  (Tr. at 519:4-16).  CIGNEX believed that it could overcome any issues and the parties continued work on the MyLam.com redesign project.  (*Id.*).  Then, on August 1, 2016, CIGNEX contacted Lam to resume discussions about payment and, in particular, Lam's proposal to link payment to milestone completions.  (DTX-62 at pg. 1).  CIGNEX noted that there had been no "firm resolution" on that proposal and expressed a desire to meet to reach agreement on outstanding tasks and launch dates, as well as for "release of a major portion of the outstanding invoices immediately."  (*Id.*).  Lam agreed that a meeting was necessary, noting that another "several months ha[d] passed and milestones . . . still ha[d] not been achieved."  (*Id.*).

40.     On August 5, 2016, Lam issued a stop-work order to CIGNEX for the MyLam.com redesign project.  (DTX-65 at pg. 1).  The stop-work order issued because of a "third security vulnerability" from CIGNEX's work, which was discovered by Lam on July 29, 2016.  (*See, e.g.*, DTX-65 at pg. 1; Tr. at 525:10-526:14).  The security issue arose because CIGNEX did not set up a network firewall environment correctly and, as a result, Lam's documents were exposed to the general web.  (Tr. at 526:3-12).  In response to a request for clarification from CIGNEX, Lam (through Mr. Estes) indicated that the stop work order was "a temporary halt" and that "Lam and CIGNEX team members should still continue to work together."  (PTX-252 at pg. 1).

41.     CIGNEX and Lam worked together to resolve the security issue despite the stop-work order, and the security issue was eventually resolved.  (Tr. at 526:20-527:7).  CIGNEX did not perform any further development work on the MyLam.com redesign project after that point.

42.     CIGNEX's work on the project never went "live" on MyLam.com.  (SUF ¶ 25).

### G.     CIGNEX's Outstanding Invoices that Remain Unpaid

43.     CIGNEX billed additional costs from the agreed-upon CR-1, CR-2 and CR-3 to Lam in Invoice Nos. 21254 and 21475, totaling $232,039.71.  (*See* PTX-375 at pgs. 15-19; *see also* PTX-297).  Invoice Nos. 21254 and 21475 set forth a breakdown of the hours spent by various individuals in connection with the work performed in July and August 2015.  (*See* PTX-375 at pgs. 15-19).

44.     CIGNEX ultimately billed the additional cost from CR-4 to Lam in Invoice No. 30513, totaling $99,737, but without any breakdown of time or materials spent in connection with CR-4.  (*See* PTX-375 at pg. 23; *see also* SUF ¶ 24).  Another version of Invoice No. 30513 sets forth items purportedly worked on by CIGNEX in connection with CR-4.  (*See* PTX-256).

45.     CIGNEX ultimately billed the additional cost from CR-5 to Lam in Invoice No. 30514, totaling $23,345, but again without any breakdown of time or materials spent in connection with CR-5.  (*See* PTX-375 at pg. 24; JTX-42; *see also* SUF ¶ 24).  Another version of Invoice No. 30514 sets forth items purportedly worked on by CIGNEX in connection with CR-5.  (*See* PTX-257).

46.     On September 15, 2016, CIGNEX sent a letter to Lam requesting payment of three overdue invoices:  Invoice Nos. 21254, 21475 and 30104.  (*See* JTX-41).  These invoices were dated August 21, 2015, October 29, 2015, and May 11, 2016, respectively, and together they totaled $290,839.71.  (*Id.*).

47.     On September 30, 2016, CIGNEX issued the following three invoices "due upon receipt":  Invoice No. 30512 in the amount of $20,175.00 (for LAM User Training); Invoice No. 30513 in the amount of $99,737.00 (for CR-4); and Invoice No. 30514 in the amount of $23,345.00 (for CR-5).  (SUF ¶ 24).

48.     Lam never paid Invoice Nos. 21254 and 21475 (together, constituting work for CR-1, CR-2 and CR-3).   (*See, e.g.*, JTX-41).   Lam never paid Invoice No. 30513 (CR-4). (SUF ¶ 24).  Lam never paid Invoice No. 30514 (CR-5).  (SUF ¶ 24).[5]

## III.   <u>LEGAL STANDARDS</u>

### A.     **Breach of Contract**

To prevail on a claim of breach of contract under Delaware law,[6] a plaintiff must prove: (1) existence of a contract, (2) defendant breached an obligation imposed by the contract and (3) plaintiff suffered damages from the breach.  *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  In Delaware, a valid contract exists when the parties intended to be bound by the contract, the contractual terms are sufficiently definite and the parties exchange legal consideration.  *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).  "A contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do."  *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018).  Moreover, to be enforceable, a contract must contain all material terms.  *Id.* at 1230; *see also Osborn*, 991 A.2d at 1159.

Interpretation of a contract is ultimately a question of law.  "When interpreting a contract, the role of a court is to effectuate the parties' intent," and "a combination of the parties' words and

---

[5]     Invoice No. 30104 is no longer an issue, as that invoice relates to the Alfresco license addressed in the Court's summary judgment opinion.  (*See* D.I. 94 at 9).  Additionally, the $20,175 due under Invoice No. 30512 (for Lam user training) does not appear to be part of CIGNEX's damages request.  CIGNEX requests $355,121.71 in damages (*see* D.I. 115 at 20), which is the sum of amounts due under Invoice Nos. 21254, 21475, 30513 and 30514 (CR-1 through CR-5).

[6]     The Agreement states that it is governed by the laws of the State of Delaware (PTX-44 ¶¶ 17-18), and the parties do not dispute that Delaware law applies to the claims in this action.

the plain meaning of those words where no special meaning is intended" constrains a court in its interpretation of that contract. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). In situations where the contract terms are ambiguous, however, the Court must look beyond the four corners of the contract to determine the parties' intentions. *See AT&T Corp. v. Lillis*, 953 A.2d 241, 253 (Del. 2008). "[W]hen there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). In construing ambiguous terms, the Court may look to, *inter alia*, prior agreements, communications between the parties and course of conduct among the parties. *See id.* at 1233.

### B.      Breach of the Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract. *See TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 329 (D. Del. 2014). "The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)). "[T]he implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap*, 878 A.2d at 442 (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985)). A party is liable for breaching this implied covenant when its conduct frustrates the overall purpose of the

contract "by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442. The Delaware Supreme Court has cautioned, however, that the implied covenant of good faith and fair dealing should only rarely be used to imply terms in a contract. *See, e.g.*, *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1259 (Del. 2004); *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

### C. Unjust Enrichment

"Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (citation and internal quotation marks omitted). To prevail on a claim of unjust enrichment, a plaintiff must prove: (1) an enrichment, (2) an impoverishment, (3) there is a relation between the enrichment and impoverishment, (4) absence of justification and (5) absence of remedy at law. *See Nemec*, 991 A.2d at 1130. Unjust enrichment is thus an equitable remedy.

As to the interplay between a claim of breach of contract and a claim of unjust enrichment, "[c]ourts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract." *ID Biomedical Corp. v. TM Techs., Inc.*, No. 13269, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995). "It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim." *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012).

IV.     **DISCUSSION**

A.      **CIGNEX and Lam's Breach of Contract Claims**

CIGNEX alleges that Lam breached the Agreement by failing to pay for the amounts due under CR-1, CR-2, CR-3, CR-4 and CR-5, whereas Lam alleges that CIGNEX breached the Agreement (and breached it in bad faith) by failing to complete the MyLam.com redesign project. (*See* D.I. 115 at 15-19; *see also* D.I. 113 at 3-8).  Because both CIGNEX's and Lam's breach of contract claims largely turn on whether the Agreement was a "time and materials" contract, as opposed to a "fixed price" contract that obligated CIGNEX to deliver the completed MyLam.com project in order to receive compensation, the Court must first address the type of contract at issue here.

On the record available at summary judgment, the Court was unable to determine definitively whether the Agreement was a "time and materials" contract.  (*See* D.I. 94).  Having now reviewed the evidence presented at trial, the Court concludes that the Agreement was a "time and materials" contract.  The language of the Agreement itself suggests that both parties intended CIGNEX to perform services and be compensated for those services as it worked on the MyLam.com redesign project.  (*See, e.g.*, PTX-44 at pg. 1 ("The Description of Work, which is Exhibit A to this Contract, describes ***the services*** that [CIGNEX] will perform and the fees which [Lam] will pay in return." (emphasis added)); *id.*, Ex. A ¶ 1 ("Services to be Provided:  Contractor shall render ***such services*** as may be necessary to complete in a professional manner the project described as follows:   Software integration, and POC, for MyLam/PK Redesign Project.") (emphasis added)).  SOW 2, which is integrated into the Agreement, states that the contractual relationship between the parties was a time and materials one:  "Terms & Conditions:  Time and Material."  (JTX-2 at pg. 1; *see also id.* at pg. 13 ("This is a Time and Materials (T&M)

estimate.")).  These contractual provisions suggest that the parties intended CIGNEX to perform services on the MyLam.com redesign project and, in turn, Lam would compensate CIGNEX for those services.

Moreover, testimony elicited at trial provided further clarity that the parties intended (and understood) the Agreement to be a "time and materials" contract, whereby CIGNEX would provide services for the MyLam.com redesign and Lam would pay for those services on a "time and material" basis.  Indeed, witness testimony from both sides at trial makes clear that the parties considered the Agreement to be a "time and materials" contract.  (*See, e.g.*, Tr. at 43:8-46:13, 49:20-50:25 (Mr. Tadeparti testifying that Agreement provided for work on "time and materials" basis); Tr. at 198:16-24 & 214:8-11 (Mr. Ramachandran testifying that the Agreement was "time and materials" and never transitioned to "fixed price"); Tr. at 304:24-305:8 (Ms. Schwermer admitting the Agreement was not a "fixed price contract" and instead was a "time and materials" contract"); Tr. at 533:2-19 (Mr. Estes admitting that the Agreement "started out" as a "time and materials" contract and Lam "never renegotiated" it to be a "fixed price" contract); *see also* PTX-217 at pg. 2 (Lam employee stating in email that the SOW "is a time and materials agreement")).  Thus, the Agreement is properly considered a "time and materials" contract and not a "fixed price" contract.  Having concluded this, the Court now addresses the breach of contract claims asserted by each party.

### 1.   CIGNEX's Breach of Contract Claim

CIGNEX argues that Lam breached the Agreement by failing to pay for the amounts due under the five change requests:  CR-1, CR-2, CR-3, CR-4 and CR-5.  (*See* D.I. 115 at 15-19).  As for CR-1, CR-2 and CR-3, CIGNEX asserts that Lam agreed to and executed these change requests in writing and thus Lam is liable for the additional costs associated with the change requests.  (*Id.*

at 16; *see also* PTX-43, PTX-44 & PTX-45).  The additional costs from CR-1, CR-2 and CR-3 were billed to Lam in Invoice Nos. 21254 and 21475, totaling $232,039.71.  (*See* PTX-375 at pgs. 15-19; *see also* PTX-297).  These invoices are dated August 21, 2015 and October 29, 2015, and they both set forth the amount of time spent by various CIGNEX individuals on certain phases of the project, along with their hourly rates.  (*See* PTX-375 at pgs. 15-19).  As to CR-4 and CR-5, although these were not agreed to and executed in writing, CIGNEX nevertheless argues that Lam agreed to these change requests (or at least knew that they were necessary) and therefore the amounts due under the requests are owed to CIGNEX.  (*See* D.I. 115 at 16-19).  The additional costs from CR-4 and CR-5 were billed to Lam on September 30, 2016 in Invoice Nos. 30513 and 30514, totaling $123,082.00.  (*See, e.g.*, PTX-375 at pgs. 23-24; JTX-42; *see also* SUF ¶ 24).  All of these invoices remain unpaid.  According to CIGNEX, Lam has breached the Agreement by failing to pay for the costs associated with CR-1, CR-2, CR-3, CR-4 and CR-5 and, as a result, CIGNEX is entitled to $355,121.71.  (*See* D.I. 115 at 20).[7]

The five change requests at issue were modifications to the scope of the MyLam.com redesign project, and the changes often included additional costs to the original estimate.  As such, the Court understands (and the parties do not seem to dispute) that these change requests were effectively modifications to the terms of the Agreement and the scope of the project set forth in SOW 2.  Therefore, to be valid and enforceable amendments to the terms of the parties' agreement, the change requests must comply with the requirements of the Agreement and SOW 2 (and include agreement on the material terms).  The Agreement provided that waivers, modifications and

---

[7]     As to CR-4, CIGNEX argues that it should at least receive $66,971.00, which is the amount the Lam offered to pay as negotiations over CR-4 progressed.  (*See* D.I. 115 at 17-18; *see also* PTX-297 at pg. 1).  In that case, the total damages requested by CIGNEX would be $322,355.71.

amendments to the contract terms must be in writing and signed by the party to be charged (*i.e.*, Lam).  (PTX-44 ¶ 20).  Moreover, SOW 2, which incorporated the terms of the Agreement, also provided that any changes to the scope of SOW 2 must be made "using project change management tools and procedures duly signed off by the Lam and CIGNEX representatives." (JTX-2 at pg. 17).  Therefore, in the Court's view, whether Lam is in breach for failing to pay amounts due for work performed under the five change requests turns on whether the change requests were valid amendments to the terms of the parties' agreement – *i.e.*, whether Lam agreed to and executed in writing the various change requests.

As to CR-1, CR-2 and CR-3, there is no dispute that Lam agreed to and executed these change requests.  (SUF ¶¶ 10-11; *see also* PTX-43; PTX-44; PTX-45).  Indeed, all three of these change requests were signed between April and June of 2015 by Mr. Estes on behalf of Lam. (*See* JTX-43 at pg. 2; JTX-44 at pg. 4; JTX-45 at pg. 4).  Lam nevertheless argues that it is not obligated to pay the invoices corresponding to CR-1, CR-2 and CR-3 (*i.e.*, Invoice Nos. 21254 and 21475) for several reasons.  (*See* D.I. 123 at 17-18).  First, Lam argues that it "disputed" these invoices – by stating generally in August 2015 that it would not pay invoices until the project got back on track – and thus there is no obligation to pay.  (*Id.* at 17).  Lam next asserts it only agreed to these three change requests "because it believed approval would lead to delivery of MyLam.com" (*id.*) and, thus, in Lam's view, Lam is not obligated to pay because MyLam.com was never completed and delivered.  Lam also argues that it should not have to pay Invoice Nos. 21254 and 21475 because there is no indication on those invoices that the work described actually corresponds to CR-1, CR-2 and CR-3.  (*Id.*).  The Court disagrees with Lam on each of these points.

Starting first with Lam's argument that it only agreed to CR-1, CR-2 and CR-3 because it believed completion of MyLam.com would follow, the Court is unpersuaded that this excuses payment. This argument is simply another manifestation of the dispute over whether the Agreement (including subsequent modifications to it) was a "time and materials" contract or a "fixed price" contract. The Agreement was a "time and materials" contract that obligated Lam to pay for services rendered by CIGNEX as the project proceeded, which includes additional work (and costs) that Lam agreed to under the contract's procedure for modifying the terms. And although Lam generically told CIGNEX it was suspending payments because the project was off track, CIGNEX never agreed to condition payment on delivery of the completed MyLam.com project and CIGNEX continued asking for payment. (*See, e.g.*, PTX-297 at pg. 1 ("Please don't tie the above amount [from CR-1, CR-2 and CR-3 invoices] to project progress . . . ."); DTX-62 at pg. 1 (CIGNEX noting that there had been no "firm resolution" on conditioning payment on project completion and expressing desire to discuss "release [of] a major portion of the outstanding invoices immediately."); Tr. at 543:13-19, 546:16-25 (Mr. Estes admitting that CIGNEX never stopped asking for payment)).[8] In the Court's view, Lam's general statement that it was temporarily suspending payments does not constitute a dispute of any particular invoice sufficient to excuse payment under the Agreement.

Finally, as to Lam's argument that it should not have to pay because CIGNEX did not produce any invoices "specifically related" to CR-1, CR-2 and CR-3, the Court is likewise unpersuaded. At trial, Lam offered no evidence questioning whether Invoice Nos. 21254 and

---

[8]     In the Court's view, if CIGNEX agreed to condition payment on delivery, then that would mean that the contract was no longer a "time and materials" contract. Yet, as Mr. Estes testified, the contract always remained a "time and materials" contract – *i.e.*, one that obligated Lam to pay for services rendered. (*See* Tr. at 533:2-19).

21475 correspond to work under these change requests.   And in its post-trial papers, Lam's assertion on this point is based solely on attorney argument and limited to a single conclusory paragraph.   (*See* D.I. 123 at 17).   In essence, Lam's argument is that CIGNEX was required to send an invoice that specifically uses the words "CR-1," "CR-2" and "CR-3" to be entitled to payment.   The Court rejects this proposition, particularly given that CIGNEX invoiced its work on a "time and materials" basis.   Indeed, Invoice Nos. 21254 and 21475 set forth the time spent by various CIGNEX individuals in the July / August 2015 timeframe, which is shortly after the three change requests were executed.   The Court finds no basis in the record to doubt that Invoice Nos. 21254 and 21475 are for work under CR-1, CR-2 and CR-3.   And because Lam agreed in writing to CR-1, CR-2 and CR-3 pursuant to the procedures for modifying the terms of the parties' agreement (and the scope of the project), Lam has breached the Agreement for failing to pay the invoices for work performed under these three change requests.   Lam is thus liable to CIGNEX for the amounts due under Invoice Nos. 21254 and 21475 – *i.e.*, $232,039.71.

Turning now to CR-4 and CR-5, the Court disagrees with CIGNEX that Lam agreed to these change requests and is therefore also liable for the amounts due under the corresponding invoices (*i.e.*, Invoice Nos. 30513 and 30514).   As with CR-1, CR-2 and CR-3, these later two change requests were also amendments to the terms of the parties' agreement and therefore must comply with the contractual requirements for modifications (*i.e.*, agreement in a signed writing). Unlike CR-1, CR-2 and CR-3, however, there are no written documents executed by Mr. Estes or anyone else at Lam that demonstrate agreement between the parties on CR-4 and CR-5.   Indeed, at least one CIGNEX witness admitted there was, in fact, no agreement on CR-4 and CR-5.   (*See, e.g.*, Tr. at 217:25-218:6; *see also* Tr. at 149:1-9 & 179:14-16 (Mr. Tadeparti testifying that there was no approval for CR-4)).   On CR-4 specifically, CIGNEX acknowledges "there is no form

prepared for signatures in the record" and "no written approval by Lam in the record," the details of CR-4 appear in various drafts of the SRS.  (*See* D.I. 115 at 16-17).  According to CIGNEX, however, Lam was aware that CR-4 was necessary (*see* Tr. at 324:17-19 & 530:18-531:3), and the parties had ongoing discussions about the terms of CR-4, with Lam counteroffering $66,971 for CR-4 in response to the originally quoted $92,800 (*see* PTX-297 at pg. 1).  As to CR-5, CIGNEX argues that Lam agreed to CR-5 in an email from Mr. Estes.  (*See* D.I. 115 at 18; *see also* PTX-229 at pg. 3 ("If you are asking if I approve the scope of work and $$, the answer is yes I approve.")).  In CIGNEX's view, there was no requirement that Lam agree to CR-4 and CR-5 in a ***signed*** writing – rather, it was sufficient that Lam knew the work was necessary and engaged in negotiations or that it agreed to the "scope of work" and cost in an email.  In light of the language of the Agreement and SOW 2, the Court disagrees.

The Agreement requires modifications to the contract's terms to be in writing and signed by Lam, and SOW 2 incorporates the terms of the Agreement.  (*See* PTX-44 ¶ 20; *see also* JTX-2 at pg. 1 ("This Statement of Work . . . is subject to the terms and conditions of the Contract for Independent Contractor or Consultant Services [the Agreement] between the parties.")).  Any changes to the scope of the project – originally set forth in SOW 2 – required Lam's agreement in a signed writing.  (*See, e.g.*, PTX-44 ¶ 20; JTX-2 at pg. 17).  There is no signed agreement by Lam as it relates to either CR-4 or CR-5.  As to CR-4, the parties never reached agreement on price – a material term – and Lam never approved any proposal for CR-4.  (*See* PTX-297 at pg. 1 (price negotiations still ongoing in December 2015)).  And as to CR-5, in response to Mr. Estes's purported email approval on CR-5, Mr. Pillai requested a "signed copy of the document" as was usually done.  (*See* PTX-229 at pg. 2).  To the Court, this suggests that CIGNEX was aware that a signed writing was necessary for Lam's approval.  And in fact, follow-up emails from CIGNEX

personnel further suggest that CR-5 was still being negotiated, and CIGNEX was still seeking a signed copy indicating approval.  (*See* PTX-229 at pg. 2 ("Attached is the latest and updated document with all the feedback requested by you and Tim.  Kindly request you to get signed copy of the CR documentation.")).  Therefore, because Lam did not agree to CR-4 and CR-5 pursuant to the contractual provisions for changing the terms of the parties' agreement, Lam is not liable for amounts due under invoices in connection with work under CR-4 and CR-5.[9]

### 2. Lam's Breach of Contract Claim

As to Lam's claim for breach of contract, Lam argues that the Agreement (and SOW 2) obligated CIGNEX to deliver a completed MyLam.com and CIGNEX was therefore in breach of the Agreement when it failed to complete the project.  (*See* D.I. 113 at 3-8).  In support, Lam points to language in Exhibit A of the Agreement, which provides that CIGNEX "shall render such services as may be necessary to ***complete*** in a professional manner" the Proof of Concept and MyLam.com redesign project.  (PTX-44, Ex. A ¶ 1 (emphasis added); *see also* D.I. 113 at 3).  According to Lam, this language demonstrates a contractual obligation on the part of CIGNEX to complete and deliver MyLam.com in order to be entitled to payment under the Agreement. (*See* D.I. 113 at 3).  Further, in Lam's view, the conduct of both parties demonstrated a mutual intent for CIGNEX to deliver a complete MyLam.com pursuant to the Agreement.  (*Id.* at 5-8). On this point, Lam relies on Ms. Schwermer's testimony that each invoice would be reviewed and discussed with CIGNEX to ensure the project was still on track for completion such that payment was "appropriate."  (*Id.* at 5-6 (citing Tr. at 282:20-283:1)).  As further evidence to support its

---

[9]      To be clear, the Court rejects CIGNEX's claim that it should at least receive the amount that Lam offered to pay for CR-4 (*i.e.*, $66,971).  (*See* PTX-297 at pg. 1).  CIGNEX never accepted that counteroffer and, indeed, responded to that proposal with its own counteroffer of $82,468.  (*Id.*).  There was no agreement on price for CR-4.

argument that the parties intended the Agreement to require project completion, Lam relies on the fact that Lam stopped paying CIGNEX mid-project after informing CIGNEX that there would be no further payments "until they could demonstrate they could actually complete some of the milestones or the plans they presented."  (Tr. at 528:23-529:5; *see also* D.I. 113 at 6).  Because CIGNEX never completed the project, Lam requests return of all payments made to CIGNEX, as well as the costs of hiring three independent consultants to review CIGNEX's work and advise whether it was feasible to allow CIGNEX to proceed to completion, a total sum that Lam asserts is $768,908.29.  (*See* D.I. 113 at 7-8, 20; *see also* D.I. 123 at 20).[10]

In the Court's view, Lam's breach of contract claim is predicated upon a finding that the contract was a "fixed price" contract – *i.e.*, one that required delivery of a completed site in order for CIGNEX to receive payment.  Stated differently, in order for the Court to agree with Lam and find CIGNEX liable for breach of contract under the asserted theory, the Court must find that CIGNEX breached a provision requiring that it complete the MyLam.com project.  As set forth above, however, the Agreement was a "time and materials" contract and, as such, CIGNEX was entitled to payment for services (and materials) rendered while working on the MyLam.com redesign.  (*See supra* § IV.A).  That is, CIGNEX was not contractually obligated to complete the MyLam.com redesign project to receive payment (or even at all).  To the extent that a properly drafted "time and materials" contract could nevertheless obligate CIGNEX to complete the MyLam.com project (*see* D.I. 123 at 14-15), the Court finds there was no provision creating such an obligation here.  Thus, Lam's claim that CIGNEX breached the Agreement by not delivering a completed MyLam.com must fail.

---

[10]     The Court added the amounts that Lam paid to CIGNEX (*i.e.*, $665,985) and to the independent consultants (*i.e.*, $112,923.29) and obtained a total of $778,908.29.

The Court is mindful, however, that Lam is unhappy with the quality of work that CIGNEX performed, as well as the outcome of the overall project and the additional costs incurred by Lam to remedy the situation.  As set forth in the Court's findings of fact, there were numerous missteps, delays and security vulnerabilities caused by CIGNEX over the course of the project.  Lam argues that CIGNEX's repeated failures – including failure to complete the project – render CIGNEX liable for breach of contract.  Although the Court understands Lam's frustration with the apparently questionable work performed by CIGNEX, that the project did not proceed as Lam hoped does not compel a finding that CIGNEX was in breach of the Agreement.  There is simply no contractual provision that obligated CIGNEX to complete the project.  Moreover, it is noteworthy that the Agreement was a form contract provided by Lam – a sophisticated company – which certainly could have included a provision that required CIGNEX to deliver a completed and satisfactory MyLam.com before payment was ever due.  And further, at any one of the apparently problematic stages during CIGNEX's tenure on the project, Lam could have terminated the contract and moved on to another company.  (*See* PTX-44 ¶ 2 (contract can be terminated without cause as long as proper notice given)).  Lam chose not to do so, allowing CIGNEX to proceeded to work on the project even as deadlines continued to lapse without substantial progress.

Finally, as to Lam's bad-faith breach claim, the Court is doubtful that Delaware recognizes this cause of action in cases such as this.  *See, e.g.*, *IMO Ronald J. Mount 2012 Irrevocable Dynasty Tr. U/A/D Dec. 5, 2012*, No. 12892-VCS, 2017 WL 4082886, at *6 (Del. Ch. Sept. 7, 2017) ("Ian's second count, a claim for 'bad faith breach of contract,' must be dismissed for the simple reason that the claim, as styled, does not exist in our law.").[11]  In any event, a bad faith breach of contract

---

[11]    Such a claim is available in the context of insurance contracts.  *See Bennett v. USAA Cas. Ins. Co.*, 158 A.3d 877, 877 n.21 (Del. 2017).

claim is still a contract claim. *See Johnson v. Gov't Employees Ins. Co.*, No. 06-408-RGA, 2014 WL 2708300, at *3 (D. Del. June 16, 2014), *aff'd sub nom. Johnson v. GEICO Cas. Co.*, 672 F. App'x 150 (3d Cir. 2016). Because the Court has found that CIGNEX is not liable to Lam for breach of contract, there can be no liability for bad faith breach of contract.[12]

### 3.   Lam's Defenses to CIGNEX's Breach of Contract Claim

In its opening post-trial papers, Lam asserts several defenses to CIGNEX's breach of contract claim. None of those defenses, however, is particularly developed or raised in any detail in Lam's answering post-trial papers.[13] First, Lam argues that the Agreement obligates CIGNEX to indemnify Lam for any breach of contract claims. (D.I. 113 at 13). Next, Lam argues that CIGNEX breached the Agreement by failing to deliver MyLam.com according to "deadlines it promised" and, therefore, Lam's performance is excused (*i.e.*, payment was not required). (*Id.* at 14). Finally, Lam argues that CIGNEX's breach of contract claim is barred by acquiescence and estoppel because CIGNEX continued to work for "approximately a year" without submitting invoices or being paid. (*See* D.I. 113 at 19-20).

Turning first to Lam's argument that its performance is excused because CIGNEX was in breach for failing to deliver MyLam.com by various deadlines, the Court disagrees. (*See* D.I. 113 at 14 (referring to PTX-44 ¶ 2 (contractual provision excusing performance if other party is in

---

[12]     The Court also declines to award Lam damages for two software licenses – amounts that are set forth in Invoice Nos. 20887 and 20886. (*See* D.I. 113 at pg. 18). Lam offers no analysis for this request, and this theory was never addressed at trial (nor was it in the Pretrial Order). There is simply insufficient evidence in the record for the Court to rule on this (belated) request.

[13]     In fact, there appear to be defenses littered throughout both of Lam's opening and answering post-trial briefs, and the Court struggled to find a clear presentation of Lam's defenses to CIGNEX's breach of contract claim. That being said, however articulated, most of Lam's defenses seem to require the Court to find the parties' contract to be one that obligated CIGNEX to complete the MyLam.com project. Any such defense must fail.

breach)).  There was no contractual obligation for CIGNEX to deliver a complete MyLam.com in order for Lam to be obligated to provide payment.  Indeed, there was no provision requiring CIGNEX to complete the project at all.

As to Lam's claim for indemnification, the Agreement provides:

> Contractor [CIGNEX] agrees to be responsible for his/her/its own actions and those of any of its employees or agents who provide services under this Contract.  Contractor [CIGNEX] agrees to indemnify, hold harmless and, upon Company's [Lam's] request, defend Company [Lam] and its directors, officers, its employees and agents from and against all claims and losses of any type, including reasonable attorneys' fees, in connection with, in whole or in part: . . . (b) Any breach of this Contract . . . .

(PTX-44 ¶ 7).  Lam argues that this language "can only mean that the parties intended that Cignex indemnify Lam for any harm that befell Lam as a consequence of Cignex breach."  (D.I. 113 at 13; *see also* D.I. 123 at 16-17).  Yet Lam's only argument as to CIGNEX being in breach is that CIGNEX failed to complete the MyLam.com redesign.  The Court has already found, however, that the parties' agreement did not obligate CIGNEX to complete the MyLam.com project. Therefore, even if Lam's reading of this indemnification provision were correct,[14] Lam has not demonstrated that CIGNEX was in breach such that indemnification is triggered.

Finally, the Court rejects Lam's contention that CIGNEX is estopped from recovery because it acquiesced in continuing to work without payment (or invoicing) after Lam said

---

[14]    The Court doubts that this indemnification provision applies to direct claims in the manner that Lam suggests.  Indemnification provisions usually apply to third-party claims – *e.g.*, a third party sues Lam for damages resulting from an act by CIGNEX or one of its agents, and the indemnification provision requires CIGNEX to defend and hold harmless Lam for any resultant damages.  Indeed, if Lam's interpretation of this provision were correct, Lam could request CIGNEX to "defend" Lam in a claim that Lam itself brought – *i.e.*, CIGNEX would be litigating against itself.  *See, e.g., Column Form Tech., Inc. v. Caraustar Indus., Inc.*, No. 12C-09-050JRJ CCLD, 2014 WL 2895507, at *8 (Del. Super. Ct. June 10, 2014) ("Plaintiffs' interpretation of [parties' indemnification provision] would permit Plaintiffs to step into Caraustar's shoes in this dispute and take over Caraustar's defense.  Such an interpretation would defy logic.").

payment would be suspended until the project was back on track.  (*See* D.I. 113 at 19-20).  The doctrine of acquiescence precludes recovery where a plaintiff has full knowledge of its rights and "(1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved."  *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014); *see also Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.*, No. 8321-VCG, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014) ("The doctrine of acquiescence effectively works an estoppel:  where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking protection of those rights."), *aff'd*, 105 A.3d 989 (Del. 2014).  As already discussed above, CIGNEX never acquiesced to nonpayment for work performed in connection with CR-1, CR-2 and CR-3.[15]  Indeed, CIGNEX continued to request payment for the services it was rendering and repeatedly asked for payment of outstanding invoices, including those relating to CR-1, CR-2 and CR-3.  (*See, e.g.*, DTX-62 at pg. 1 (CIGNEX expressing desire to discuss "release of a major portion of the outstanding invoices immediately."); PTX-297 at pg. 1; PTX-229 at pg. 1; PTX-137 at pg. 2; PTX-356 at pg. 1).  Mr. Estes, the Lam project manager in charge of invoicing, admitted that CIGNEX never stopped asking for payment.  (*See* Tr. at 543:13-19, 546:16-25).  Thus, the Court finds that, contrary to Lam's argument, CIGNEX did not acquiesce in nonpayment such that it is estopped from recovering the amounts due under invoices relating to CR-1, CR-2 and CR-3.

---

[15]     Because the Court finds that CIGNEX is not entitled to recover damages in relation to CR-4 and CR-5 (*see supra* § IV.A.1), this analysis is limited to CR-1, CR-2 and CR-3.

In sum, the Court finds that all of Lam's counterclaims and defenses fail and that CIGNEX partially prevails on its breach of contract claim and is entitled to amounts due under invoices for CR-1, CR-2 and CR-3, totaling $232,039.71.  Although CIGNEX requests interest on any amount awarded, other than a single statement in the conclusion (*see* D.I. 115 at 20; D.I. 121 at 20), there is no indication of whether CIGNEX is seeking pre- or post-judgment interest (or both), nor is there any analysis for the interest rate and frequency of compounding.  In connection with any motion for attorneys' fees (*see infra* § IV.D), CIGNEX must also set forth an analysis on interest.

### B.      Lam's Claim for Breach of Duty of Good Faith and Fair Dealing

Lam argues that, to the extent there is no express contractual requirement for CIGNEX to deliver a complete and functioning MyLam.com website, the Court should nevertheless find that requirement implied under the covenant of good faith and fair dealing.  (*See* D.I. 113 at 9-11).  That is, in Lam's view, there is a gap in the Agreement's express terms as it relates to the parties' intent for CIGNEX to deliver a completed MyLam.com, and the Court can and should fill that gap.  (*Id.* at 10).  The Court declines to do so.

CIGNEX and Lam are both sophisticated companies that are capable of envisioning terms – including material terms – important to their interests and incorporating those terms into their contracts.  Here, the form of contract was provided by Lam.  (*See, e.g.*, Tr. at 193:17-25).  If it were important for Lam to have a provision ensuring completion of the MyLam.com project, then Lam should have included it in the form of contract they provided to CIGNEX.  As the Delaware Supreme Court has recognized, "[p]arties have a right to enter into good and bad contracts, the law enforces both."  *Nemec*, 991 A.2d at 1126.  The purpose of the implied covenant of good faith and faith dealing is not to rewrite the contract to capture terms that one party wishes that it included at the outset, but rather to address situations where the other party "has acted arbitrarily or

unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Id.* Lam has failed to prove that is the case here.

### C.     Lam's Claim for Unjust Enrichment

As to Lam's claim for unjust enrichment, Lam recognizes that this claim must fail if the Court finds there is an enforceable contract that governs the parties' relationship. (*See* D.I. 113 at 12 ("In the event Lam has no remedy at law, the Court may grant Lam relief pursuant to its claim that Cignex has been unjustly enriched at Lam's expense.")).  As set forth above, the law in Delaware is clear that the equitable remedy of unjust enrichment is unavailable where the parties' relationship is governed by contract. (*See supra* § III.C).  Because the alleged wrong here arises from a relationship governed by a valid and enforceable contract formed between Lam and CIGNEX, Lam cannot recover under a theory of unjust enrichment.

### D.     CIGNEX's Claim for Attorneys' Fees Under the Contract

In its post-trial brief, CIGNEX requests attorneys' fees pursuant to the terms of the Agreement. (*See, e.g.*, D.I. 115 at 19-20; *see also* JTX-44 ¶ 19).  Paragraph 19 of the Agreement provides that, in any judicial proceeding over a dispute arising out of the Agreement, the prevailing party "is entitled to recover all reasonable expenses associated with such proceeding (including without limitation reasonable costs and fees of attorneys and other professionals) . . . ." (JTX-44 ¶ 19).  The Agreement also provides limitations on the costs and fees recovery when the prevailing party previously refused a settlement offer pertaining to the dispute.  First, if the prevailing party's actual recovery in the proceeding is less than a settlement offer refused by the prevailing party, then no costs or fees shall be recovered.  (*Id.* ¶ 19(i)).  Alternatively, if the prevailing party has refused a settlement offer that was less than the amount actually recovered in the proceeding, the

prevailing party may only recover costs and fees that "bear a reasonable relation" to recovering the difference between the refused settlement offer and actual recovery. (*Id.* ¶ 19(ii)).

In the Court's view, CIGNEX's request for attorneys' fees was premature. During closing arguments, the Court raised the issue of attorneys' fees pursuant to this contractual provision, and both sides agreed that this was a matter to be addressed after the Court's ruling. (*See, e.g.*, Tr. at 583:6-8 ("Once a ruling is issued by the court, Your Honor, then we have a prevailing party, that triggers this provision at that point in time.") (CIGNEX's counsel); Tr. at 606:5-9 ("I agree that the attorneys fees should be handled post-judgment. I think Your Honor has to make rulings as to certain – you have to make rulings on the parties' claims and I think we would analyze that and come back to the Court . . . .") (Lam's counsel)). It is thus unclear why CIGNEX requested attorneys' fees before the Court issued its post-trial opinion.[16] A motion for attorneys' fees shall follow after judgment is entered in this case within the time period prescribed by the Federal Rules.

That being said, if attorneys' fees continue to be pursued, the Court expects the parties to address the following issues – with supporting case law – in any forthcoming fees motion: (1) whether Lam's partial success on summary judgment has an impact on CIGNEX's status as a prevailing party; (2) whether CIGNEX's partial success (*i.e.*, no recovery for CR-4 and CR-5) has an impact on its status as a prevailing party; (3) whether there is a dispute that settlement offers may properly be used to address attorneys' fees in this case without running afoul of Federal Rule of Evidence 408; (4) if settlement offers may be used, what those offers were (with any supporting evidence); and (5) if there has been a mediator's proposal in this case, whether that is considered

---

[16]     Indeed, Rule 54(d)(2)(A) requires CIGNEX to point to the judgment or order that gave it prevailing party status, which would have been impossible at the time CIGNEX filed its post-trial papers.

a settlement offer within the meaning of Paragraph 19 the Agreement and, if so, what that amount was.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, CIGNEX has proven that Lam breached the Agreement by failing to pay for services rendered under CR-1, CR-2 and CR-3, but CIGNEX has failed to prove that Lam is liable for payments in connection with CR-4 and CR-5.  Lam has failed to prove that CIGNEX is liable for breach of contract, bad faith breach of contract, breach of the implied covenant of good faith and fair dealing and unjust enrichment.  An appropriate order will follow.